# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>Samsung Laptop Computer, S/N: 062Y93FP700076R; Hitachi Hard Drive, S/N: KGGEM5LE; Apple iMac Computer, S/N: C02KCEHHDNCR; Seagate External Hard Drive, S/N: 2GE7T0NC; Western Digital My Passport, S/N: WX31EA1HJ696; Transcend 8GB Thumb Drive; Sandisk Cruzer Blade Thumb Drive 4 GB | Misc. No. |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kristina Eyler, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the following items known as a Samsung

Laptop Computer, S/N: 062Y93FP700076R; Hitachi Hard Drive, S/N: KGGEM5LE; Apple

iMac Computer, S/N: C02KCEHHDNCR; Seagate External Hard Drive, S/N: 2GE7T0NC;

Western Digital My Passport, S/N: WX31EA1HJ696; Transcend 8GB Thumb Drive; Sandisk

Cruzer Blade Thumb Drive 4 GB (collectively "SUBJECT COMPUTER MEDIA DEVICES"),

currently located in Washington, DC and further described in Attachment A, for the things

described in Attachment B.

2.      I am a Special Agent with Homeland Security Investigations ("HSI") and have

been so employed since 2003.  I am currently assigned to the Northern Virginia-Washington,

D.C. Internet Crimes Against Children ("ICAC") task force.  I have earned a Bachelor of Science

degree in the field of criminal justice/psychology.  I also graduated from the Federal Law

Enforcement Training Center's Police Mixed Basic Training Program, Prince William County

Police Criminal Justice Academy, Federal Law Enforcement Training Center's Criminal

Investigator Training Program and the Immigration and Customs Enforcement Special Agent

Training Program. I have received training from the Federal Law Enforcement Training Center

and other law enforcement agencies in the areas of child pornography investigations and

pedophile behavior.

3.      As part of my current duties as an HSI agent, I investigate criminal violations

relating to child exploitation, including violations pertaining to United States citizens who travel

in foreign commerce and engage in the illicit sexual conduct with another person, outside the

jurisdiction of any particular state or district of the United States but within the extraterritorial

jurisdiction of the United States and, therefore pursuant to Title 18, United States Code, Section

3238, within the venue of the United States District Court for the District of Columbia.

4.      Because this affidavit, which is based in part on information gained through my

review of the case-related documents as well as communications with other law enforcement

officials, is only intended to show that there is sufficient probable cause for the requested

warrant, it does not set forth all of my knowledge about this matter.

## APPLICABLE LAW

5.      Title 18 United States Code § 2423 (c) makes it a federal crime for any United

States citizen who travels in foreign commerce or resides, either temporarily or permanently, in a

foreign country, and engages in any illicit sexual conduct with another person.  The penalties

under this section includes either fines or imprisonment not to exceed 30 years, or both.

6.      Title 18 United States Code § 2423 (e) makes it a crime to attempt (or conspire) to commit a violation of Title 18 United States Code § 2423 (c).

7.      Title 18 United States Code § 2423 (f) defines the term "illicit sexual conduct" to include, among other things, "a sexual act (as defined in Section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States. . . ."

8.      Title 18 United States Code § 2246 (2) defines the term "sexual act" to include, among other things, " the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. . . ."

## **PROBABLE CAUSE**

9.      On or about December 10, 2015, I received information from HSI Special Agent (SA) David Goldman, who is stationed in Bangkok, Thailand, regarding Joseph Ricky PARK, also known as Joseph DEMASI, a United States Citizen who is a convicted child sex offender currently in Thailand.   HSI has been assisting the Anti-Trafficking in Persons Division, as well as the Royal Thai Police Immigration Bureau, in the investigation of PARK since his arrival in Thailand on October 22, 2015.  Prior to PARK's arrival in Thailand, he was residing in Vietnam.

10.      Investigation into PARK by HSI and other law enforcement entities revealed the following:

> a.   In 1987, PARK was convicted in Connecticut for Risk of Injury to a Child and Sexual Assault 2nd Degree.

b. In 2002, law enforcement agents in New York received information from a cooperating defendant who stated that PARK had sexually abused multiple children in Mexico during the 1990s.

c. In March 2003, PARK travelled from the United States to Cuba, where he was arrested for Attempted Corruption of a Minor.

d. In April 2003, while incarcerated in Cuba, PARK engaged in correspondence with an individual who was later convicted of charges related to child pornography and travelling with the intent to engage in illicit sexual activity with minors.

e. In January 2009, South Korean authorities revoked PARK's visa and ordered him to leave the country after learning of his prior sex abuse conviction and receiving information that he displayed indecent behavior while working as a schoolteacher in South Korea.

f. After departing South Korea in January 2009, PARK attempted to re-enter the country in February 2009 and was arrested.  Later that month, PARK was voluntarily removed to the Philippines.

g. In September 2012, PARK applied for additional visa pages for his U.S. passport, stating that he planned to travel for an indefinite period of time to, among other places, Vietnam.

h. In November 2015, following the events described below, PARK was deported from Vietnam to Thailand.

11.     PARK's deportation from Thailand occurred after, in February 2015, the United

States Department of State received an anonymous report from a Vietnamese citizen stating, in

substance, that PARK had engaged in illicit sexual conduct with a Vietnamese juvenile (hereafter

referred to as "VICTIM") within the city of Hanoi, Vietnam.  The individual making the report

stated that VICTIM was 11 years of age at the time of the incident.

12.     As part of the report, a copy of the alleged perpetrator's business card was

provided to the U.S. Embassy.  The business card contained the following contact information:

Dr. Rick Park, Teacher of English from New York, English classes for children, teens, adults,

university students, and businessmen, Academic English and English for Special Purposes,

Email: [redacted] , Mobile: [redacted].

13.     After receiving this information, law enforcement in Vietnam located VICTIM,

having learned that the original report of abuse to the United States Department of State had been

made by VICTIM's mother.

14.     Through their investigation, including VICTIM's mother's report, law

enforcement learned the following:

      a.   The first contact between VICTIM and PARK occurred in early January 2015.

During the first encounter, PARK introduced himself to VICTIM as an English

language instructor at a park in the vicinity of St. Joseph Cathedral, Hanoi.

PARK provided VICTIM with his address and invited VICTIM to his apartment

for additional English language instruction.  PARK was reported to reside at 24B

Ly Quoc Su, Hanoi.

      b.   Approximately two weeks after their first encounter, VICTIM met PARK at his apartment.  VICTIM was accompanied by two friends, both juvenile males.  PARK played a game with the children that involved chasing and grasping each other.  The game occurred within PARK's bedroom and at times on PARK's bed.

      c.   After the game, the boys proceeded to play computer games in PARK's bedroom.  Because the bedroom was narrow, PARK sat in the middle, one boy sat to his left, one boy sat to his right, and VICTIM sat on PARK's lap.

      d.   While the boys played video games, PARK placed his hand on VICTIM's genitals and then proceeded to "pinch" and then stroke VICTIM's genitals through VICTIM's clothing.  PARK told VICTIM that he "wanted to make him feel good".

      e.   PARK then attempted to place his hand inside VICTIM's pants but VICTIM pushed PARK's hand away.

      f.   VICTIM did not believe that any of the other boys were touched while the children played computer games.  The boys departed PARK's apartment following the computer game playing without further physical contact by PARK.  VICTIM has not had any contact with PARK since the second meeting.

15.    After this information came to light, PARK was deported from Vietnam to Thailand.

16.    On November 30, 2015, HSI Bangkok SA Goldman provided HSI SA Ly Tran with information regarding a witness to PARK's criminal activity in Hanoi, Vietnam.  This potential witness, hereinafter referred as "DD", came to the attention of law enforcement

officials after he contacted the United States Embassy in Thailand and stated that he had seen child pornography material on PARK's electronic devices.  DD stated that he had items that belonged to PARK at his house and that he did not want any trouble.

17.     On December 2, 2015, SA Tran and Diplomatic Security Service SA Tom Eckert met with DD at the Hanoi Sheraton Hotel.  DD invited and escorted SA Tran and SA Eckert to his house on 1 Au Co Street, Hanoi, Vietnam.  At the house, the agents met with DD's wife, hereinafter referred as KD, and proceeded to interview the couple. DD and KD provided the following information:

    a.  In 2011, DD and KD were teaching English in Riyadh, Saudi Arabia, where they met PARK and befriended him.

    b.  In the middle of 2013, PARK was asked to leave Saudi Arabia because of his "pedophile" behavior.  DD did not know whether PARK was asked to leave because of something that happened at the school or because of PARK's history.

    c.  After PARK left Saudi Arabia, he went to Vietnam.  Around the same time, DD and KD returned to the United States.  While in the United States, DD and KD kept in regular contact with PARK via email throughout 2014.

    d.  In the course of their communications, DD and KD learned that PARK taught English in Hanoi, Vietnam and was also a part-time teacher at Hanoi University of Science.

    e.  After PARK invited DD and KD to Vietnam to teach English, DD and KD travelled to Vietnam and met with PARK in Hanoi.

f.   While there, in approximately September 2015, PARK showed DD and KD around Hanoi and took them to his apartment in the nearby Serendipity Hotel.

g.   After DD and KD moved to Hanoi, PARK provided DD and KD with a key to his apartment.  PARK also gave verbal consent for DD and KD to enter his apartment anytime to use his teaching materials.  In return, DD and KD also provided PARK their house key in case of emergency.  Their decisions to provide keys to one another was based on the friendship that they developed over the years.

h.   According to DD and KD, PARK's apartment was very dirty and not very organized.  It was a two story, one bedroom apartment.  The first floor had a very small kitchen, bathroom, and small living room.  PARK had a "Mac Book"[1] computer on the coffee table and other electronic devices on the living room floor.  PARK also had several book cases in the living room.  The second floor was one big bedroom.  DD and KD stated that clothes and books were also on the floor in this bedroom.

i.   On many occasions, DD saw adolescent males at PARK's apartment.  Because of what had happened in Saudi Arabia and PARK's behavior around these young males, DD had some concerns when he saw young males inside PARK's apartment.  DD stated that PARK overly hugged these young males and that there were never any females inside PARK's apartment.

---

[1] Upon receiving and reviewing the SUBJECT COMPUTER MEDIA DEVICES, I believe that DD's reference to a "Mac Book" computer referred to the seized Apple iMac computer.

j.  In conversation, PARK had told DD that he "likes" boys and that "it is difficult for me [PARK] to explain who I fall in love with."  PARK advised DD of a website that could explain his behavior but DD could not remember the address because, he stated, he was not interested.

k.  After PARK was deported from Vietnam to Thailand, DD kept in contact with PARK, primarily via Skype (a service that, among other things, essentially allows individuals to see and communicate with one another online through live audio-video feeds).

l.  In the course of their communications, PARK asked DD to send him money.  To that end, PARK directed DD to go into his apartment, and connect to PARK via Skype so that PARK could show DD where he hid the money.

m.  DD had been inside PARK's apartment at least fifteen times since PARK's deportation.  DD believed that PARK's landlord's nephew had moved into PARK's apartment ten days after PARK's deportation and had moved PARK's personal property to one area of the apartment.

n.  PARK directed DD to go to the upstairs bedroom, locate PARK's jacket, and remove approximately $1,000.00 USD and approximately 4,000,000.00 Vietnam Dong from the chest pocket.  PARK then directed DD to use the money to purchase a plane ticket to Thailand and to bring a laptop, a bank card, bank documents, vitamins, and leftover money to him.

o.  On approximately November 5, 2015, KD flew to Bangkok, Thailand to bring the above items to PARK.  KD could not remember the color of the laptop, but

thought it was a light grey color.  KD met PARK inside the Bangkok Airport.
PARK told her that he was trying to get back to Vietnam.  PARK stated that he
had used two private companies to take care of his visa, but they were not
successful.  KD then departed Bangkok on the same date.

p.  On approximately November 28, 2015, acting on PARK's direction, DD and KD
went to PARK's apartment to retrieve PARK's personal belongings.  DD and KD
removed almost all of PARK's personal belongings and transported them to the
fourth floor (laundry room) of DD and KD's house.  The belongings that DD and
KD retrieved included PARK's electronic devices (including the SUBJECT
COMPUTER MEDIA DEVICES), books, papers, clothes, and suitcases.

q.  Because DD was in the process of opening an English school at his home, DD
was in need of teaching materials.  DD stated that PARK told DD and KD many
times in the past to use his teaching materials in his apartment.  DD believed that
PARK may have had teaching materials saved on his electronic devices.

r.  Looking for these teaching materials, DD plugged PARK's USB hub, which had
two flash drives attached to it (a black flash drive and a white flash drive with
shiny sticker; both suspected flash drives are included in the SUBJECT
COMPUTER MEDIA DEVICES), into his desktop.  DD saw several folders pop
up.  DD clicked on one folder which contained several movie files.  DD clicked
on one movie file.  He could not recall the file name, but remembers there was
"Boy" on the file title.

s.   The file contained a movie of four adolescent white males, approximately ten to thirteen year old.  DD described the video as depicting the boys getting in and out of a hot tub, and recalled that each of the boys had an erection and none of them had any pubic hair.

t.   DD then clicked on the second movie file in the same folder.  DD immediately recognized PARK's "Mac Book" computer on the screen.  The movie was a recording of PARK's "Mac Book" computer's screen.  The recording appeared to contain a Skype video.

u.   The Skype video featured an adolescent male, naked from the waist up, between the ages of ten to thirteen, sitting on a chair.  DD could not hear any sound from the movie, but saw the adolescent male stand up, and walked back to show the adolescent male's whole naked body.

v.   DD stated that the adolescent male did not have any pubic hair.  DD could not remember if the adolescent male had erection. Approximately 40 seconds into the movie, DD stopped the movie.

w.   DD could not remember how many movies were in this folder.  DD also could not tell which of PARK's flash drives contained this folder.  Beside the computer and the flash drive(s), DD did not access any other electronic media devices.

x.   DD recalled that PARK's "Mac Book" computer was passcode locked, as he had seen on the login screen before.  DD and KD had seen PARK's flash drives, portable hard drives, and "Mac Book" computer, but not the USB hub, inside PARK's apartment on many occasions while PARK was still in Hanoi, Vietnam.

18.     In the course of the interview, Agent Tran showed DD and KD three photos.  DD was asked if he recognized anyone in the photos and DD positively identified Park in each photo.

19.     DD and KD then took SA Tran and SA Eckert to the fourth floor of their house. DD and KD pointed out to the agents PARK's personal belongings, which were collected in the corner of the room, and DD showed the agents documents that had PARK's name on them.  DD and KD informed the agents that they were the only two people that have access to this floor.

20.     Agents observed, among other things, two large suitcases, bags of books, and the SUBJECT COMPUTER MEDIA DEVICES—two flash drives (attached to an USB hub), one red laptop, one white portable hard drive, one black hard drive, and a large "Mac book".

21.     Agents gathered and removed the SUBJECT COMPUTER MEDIA DEVICES, providing DD and KD a copy of the items seized.

22.     Agents took the SUBJECT COMPUTER MEDIA DEVICES to the United States Embassy in Hanoi, Vietnam to label and secure them in SA Eckert's office.

23.     On December 3, 2015, agent Tran retrieved the SUBJECT COMPUTER MEDIA DEVICES and transported them to the HSI office in Ho Chi Minh City where they were again secured.

24.     On December 4, 2015, the SUBJECT COMPUTER MEDIA DEVICES were sent to SA Thomas West at Cyber Crime Center for further analysis pending proper court documentation.  The affidavit is made in support of a search warrant for the SUBJECT COMPUTER MEDIA DEVICES.

25.     I know, from my training and experience as well as conversations with other law enforcement agents, that individuals involved in the sexual abuse of children often record and/or document the sexual abuse, as well as behaviors and activities associated with or contributing to the sexual abuse, and that this documentation can be either intentional or inadvertent.  Examples of documentation may consist of, among other things, photographs or videos of the sexual abuse, writings about the sexual abuse acts or victims (*e.g.* journals, fantasy stories, communicating with the victim or communicating with other, like-minded individuals), and evidence of research regarding techniques, methodologies, and/or opportunities related to sexual abuse (*e.g.* how to "groom" a potential victim, opportunities for sexual abuse in foreign countries, laws regarding sexual abuse of children in various states or countries, how to access or share child-sexual-abuse materials, and techniques for avoiding detection or allaying suspicions regarding child sexual abuse).

26.     Given the ubiquity of computer media devices and the highly prevalent role that such devices play in many individuals' day-to-day activity, it is unsurprising that, as my training and experience as well as conversations with other law enforcement agents have shown, law enforcement agents commonly find evidence of child sexual abuse—including, for example, evidence of a pre-abuse relationship between an offender and a victim, evidence of communications between an offender and a victim, evidence that corroborates a victim's account of an offender's use of computer media to groom a victim, evidence that confirms an offender's place of residence and/or location at the scene of the alleged abuse, and evidence of an offender's efforts to lure, groom, and/or maintain potential victims—on an offender's computer media devices, even if the child-sexual-abuse does not directly involve the use of computer media.

13

27.     Moreover, I know from my training and experience as well as conversations with other law enforcement agents involved in cases that are sometimes described as "child sex tourism", that individuals involved in "child sex tourism" crimes, which are prohibited by such statutes as 18 U.S.C. § 2423(b), (c) and (e), have often been found to supplement their hands-on sexual abuse of children in foreign countries with child-pornography related crimes using computer media.  These crimes may include, among other things, the production (either in-person or through webcam), distribution, receipt, and/or possession of child pornography.

28.     I further know, based on my training and experience as well as conversations with other law enforcement agents involved in "child sex tourism" cases that are charged under 18 U.S.C. § 2423(b), (c) and (e), that evidence of child-pornography-related crimes has proven to be key to the investigation and ultimate prosecution of "child sex tourism" offenses.  I have learned that, in multiple cases, such evidence has been found to reveal specific and uncommon sexual interests or proclivities (such as a sexual preference for hairless, pre-pubescent boys) that corroborate the account and testimony of an offender's minor victim and that such evidence has also repeatedly led to the identification of additional minor victims.  Indeed, from these sources as well as conversations with individuals involved in the prosecution of such cases, I have learned that evidence of child pornography offenses is often highly valuable, admissible evidence in the prosecution of 18 U.S.C. § 2423 (b), (c) and (e) cases, because it shows, among other things, a defendant's sexualized interest in children and that such evidence has been found to be admissible in such prosecutions under, among other things, Federal Rules of Evidence 404(b) and 414, the latter of which governs the admissibility of evidence of similar crimes in

child-molestation cases and allows such evidence to admitted and considered on "any matter to which it is relevant."

29.     Through my training and experience, as well as conversations with other law enforcement agents involved in child exploitation cases, I have also learned that individuals who produce, distribute, receive, or possess child pornography using computer media devices often transfer child-pornography files from one media device to another.  Thus, I have learned that it is quite common to find that individuals who have stored child pornography on one computer media device have also copied, transferred, or stored child pornography on their other computer media devices.  Indeed, from my training and experience as well as conversations with other law enforcement agents involved in child exploitation offenses, I know that individuals involved in child-exploitation offenses often to seek to maintain evidence of their child exploitation crimes on multiple computer media devices and tend to seek out on smaller, more portable computer media devices—such as flash drives, external hard drives and laptop computers—presumably because, among other things, such devices may be more easily hidden or disposed of if the need arises.

### DEFINITIONS/TECHNICAL TERMS

30.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     IP Address:  The Internet Protocol address (or simply "IP") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every

computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any adversary that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

d.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

e.      "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

f.      "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

g.      "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."  See 18 U.S.C. § 1030(e)(1).

h.      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not

limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

i.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

k.      "Computer-related documentation" means written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

l.      "Domain Name" means the common, easy-to-remember names associated

with an Internet Protocol address.  For example, a domain name of "www.usdoj.gov"

refers to the Internet Protocol address of 149.101.1.32.  Domain names are typically

strings of alphanumeric characters, with each level delimited by a period.  Each level,

read backwards – from right to left – further identifies parts of an organization.

Examples of first-level, or top-level domains are typically .com for commercial

organizations, .gov for the governmental organizations, .org for organizations, and, .edu

for educational organizations.  Second-level names will further identify the organization,

for example usdoj.gov further identifies the United States governmental agency to be the

Department of Justice.  Additional levels may exist as needed until each machine is

uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web

server located at the United States Department of Justice, which is part of the United

States government.

m.      "Internet Connection" means a connection required for access to the

Internet.  The connection would be provided by cable, DSL (Digital Subscriber Line) or

satellite systems.

n.      "Internet Service Providers" or "ISPs" mean commercial organizations

which provide individuals and businesses access to the Internet.  ISPs provide a range of

functions for their customers, including access to the Internet, web hosting, e-mail,

remote storage, and co-location of computers and other communications equipment.

ISPs can offer various means by which to access the Internet including telephone based

dial-up, broadband based access via a digital subscriber line (DSL) or cable television,

dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account.  By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

o.      "Minor" means any person under the age of eighteen years.  *See* 18 U.S.C. § 2256(1).

p.      A "modem" translates signals for physical transmission to and from the Internet Service Provider, which then sends and receives the information to and from other computers connected to the Internet.

q.      A "router" often serves as a wireless access point and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  The router is in turn typically connected to a modem.

r.      "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic

abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See 18 U.S.C. § 2256(2).

s.      "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

t.      "Website" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

u.      "Wireless network" as used herein means a system of wireless communications in which signals are sent and received via electromagnetic waves such as radio waves.  Each person wanting to connect to a wireless network needs a computer which has a wireless network card that operates on the same frequency.  Many wired networks base the security of the network on physical access control, trusting all the users on the local network.  But, if wireless access points are connected to the network, anyone in proximity to the network can connect to it.  A wireless access point is equipment that connects to the modem and broadcasts a signal.  It is possible for an unknown user who has a computer with a wireless access card to access an unencrypted wireless network. Once connected to that network, the user can access any resources available on that network to include other computers or shared Internet connections.

v.      "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that

file.  It is computationally infeasible for two files with different content to have the same

SHA 1 hash value.  By comparing the hash values of files, it can be concluded that two

files that share the same hash value are identical with a precision that exceeds 99.9999

percent certainty.  There is no known instance of two different child pornographic images

or videos having the same SHA1 hash value.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

31.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the computers and/or electronic storage devices

described in Attachment A, in whatever form they are found.  One form in which the records

might be found is data stored on a computer's hard drive.  Thus, the warrant applied for would

authorize the seizure of electronically stored files or data, potentially, the copying of

electronically stored information, all under Rule 41(e)(2)(B).

32.     *Probable Cause.*  Based on my knowledge, training, and experience, as well as

information related to me by agents and others involved in this investigation and in the forensic

examination of digital devices, I respectfully submit that there is probable cause to believe that

the records and information described in Attachment B will be on the computer and electronic

storage devices described in Attachment A for at least the following reasons:

a.     Based on my training and experience, as well as my discussions with

others involved in child exploitation investigations, I know that computers and computer

technology have revolutionized the way in which child exploitation offenses are

committed.

22

b.      Individuals who engage in child exploitation offenses, including travelling

in foreign commerce and engaging in illicit sexual conduct in violation of 18 United

States Code Sections 2423 (c) and (e), use the internet and computers to allow them to

obtain child exploitation material and/or child exploitation-related materials in a

relatively secure and anonymous way.  Individuals who have a sexual interest in children

often maintain their child exploitation material and/or child exploitation-related materials

in a digital or electronic format in a safe, secure and private environment, such as a

computer.  These materials are often maintained for several years and are kept close by.

Individuals with a sexual interest in children or images of children also may correspond

with and/or meet others to share information and materials; rarely destroy

correspondence from other individuals interested in child exploitation material, child

exploitation-related material and/or children; conceal such correspondence as they do

their child exploitation material and/or child exploitation-related materials; and often

maintain lists of names, addresses, and telephone numbers of individuals with whom they

have been in contact and who share the same interests in child exploitation.

c.      Individuals who engage in the foregoing criminal activity, in the event that

they change computers, will often "back up" or transfer files from their old computers'

hard drives to that of their new computers, so as not to lose data, including that described

in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

d.      Computer files or remnants of such files can be recovered months or even

years after they have been downloaded onto an electronic storage medium, deleted, or

viewed via the Internet.  Electronic files downloaded to an electronic storage medium can

be stored for years at little or no cost.  Even when such files have been deleted, they can

be recovered months or years later using readily-available forensics tools.  When a person

"deletes" a file on a digital device such as a home computer, the data contained in the file

does not actually disappear; rather, that data remains on the electronic storage medium

until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files,

may reside in free space or slack space – that is, in space on the electronic storage

medium that is not allocated to an active file or that is unused after a file has been

allocated to a set block of storage space – for long periods of time before they are

overwritten.  In addition, a digital device's operating system may also keep a record of

deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the

Internet are automatically downloaded into a temporary Internet directory or "cache."

The browser typically maintains a fixed amount of electronic storage medium space

devoted to these files, and the files are only overwritten as they are replaced with more

recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file

from an electronic storage medium depends less on when the file was downloaded or

viewed than on a particular user's operating system, storage capacity, and computer,

smart phone, or other digital device habits.

33.     *Forensic Evidence.*  As further described in Attachment B, this application seeks

permission to locate not only electronic evidence or information that might serve as direct

evidence of the crimes described on the warrant, but also for forensic electronic evidence or

information that establishes how electronic storage media or digital devices were used, the

purpose of their use, who used them, and when.  Based on my knowledge, training, and

experience, as well as information related to me by agents and others involved in this

investigation and in the forensic examination of digital devices, I respectfully submit there is

probable cause to believe that this forensic electronic evidence and information will be on the

computer and electronic storage devices because:

      a.      Although some of the records called for by this warrant might be found in

the form of user-generated documents or records (such as word processing, picture,

movie, or texting files), digital devices can contain other forms of electronic evidence as

well.  In particular, records of how a digital device has been used, what it has been used

for, who has used it, and who has been responsible for creating or maintaining records,

documents, programs, applications, and materials contained on the digital devices are, as

described further in the attachments, called for by this warrant.  Those records will not

always be found in digital data that is neatly segregated from the hard drive, flash drive,

memory card, or other electronic storage media image as a whole.  Digital data on the

electronic storage media not currently associated with any file can provide evidence of a

file that was once on the storage medium but has since been deleted or edited, or of a

deleted portion of a file (such as a paragraph that has been deleted from a word

processing file).  Virtual memory paging systems can leave digital data on a hard drive

that show what tasks and processes on a computer were recently used.  Web browsers, e-

mail programs, and chat programs often store configuration data on a hard drive, flash

drive, memory card, or memory chip that can reveal information such as online

nicknames and passwords.  Operating systems can record additional data, such as the

attachment of peripherals, the attachment of USB flash storage devices, and the times a

computer, smart phone, or other digital device was in use.  Computer, smart phone, and

other digital device file systems can record data about the dates files were created and the

sequence in which they were created.  This data can be evidence of a crime, indicate the

identity of the user of the digital device, or point toward the existence of evidence in

other locations.  Recovery of this data requires specialized tools and a controlled

laboratory environment, and also can require substantial time.

b.      Forensic evidence on a computer or storage medium can also indicate who

has used or controlled the computer or storage medium.  This "user attribution" evidence

is analogous to the search for "indicia of occupancy" while executing a search warrant at

a residence.  For example, registry information, configuration files, user profiles, e-mail,

e-mail address books, "chat," instant messaging logs, photographs, the presence or

absence of malware, and correspondence (and the data associated with the foregoing,

such as file creation and last-accessed dates) may be evidence of who used or controlled

the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can,

after examining this forensic evidence in its proper context, draw conclusions about how

computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or

other forms of forensic evidence on storage media that are necessary to draw an accurate

conclusion is a dynamic process.  While it is possible to specify in advance the records to

be sought, electronic storage media and digital device evidence is not always data that

can be merely reviewed by a review team and passed along to investigators.  Whether

data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.        Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.        I know that when an individual uses a digital device to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of

Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

34.     *Methods To Be Used To Search Digital Devices.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.       Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.       Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from electronic storage media also requires specialized

28

tools and often substantial time.  As a result, a controlled environment, such as a law

enforcement laboratory or similar facility, is essential to conducting a complete and

accurate analysis of data stored on digital devices.

   c. The volume of data stored on many digital devices will typically be so

large that it will be extremely impractical to search for data during the physical search of

the premises.  Smart phones capable of storing 128 gigabytes, flash drives capable of

storing 128 gigabytes, and desktop computers capable of storing  a terabyte are now

commonplace.  Consequently, just one device might contain enormous amounts of data.

   d. Further, as discussed above, evidence of how a digital device has been

used, the purposes for which it has been used, and who has used it, may be reflected in

the absence of particular data on a digital device.  For example, to rebut a claim that the

owner of a digital device was not responsible for a particular use because the device was

being controlled remotely by malicious software, it may be necessary to show that

malicious software that allows someone else to control the digital device remotely is not

present on the digital device.  Evidence of the absence of particular data or software on a

digital device is not segregable from the digital device itself.  Analysis of the digital

device as a whole to demonstrate the absence of particular data or software requires

specialized tools and a controlled laboratory environment, and can require substantial

time.

   e. Digital device users can attempt to conceal data within digital devices

through a number of methods, including the use of innocuous or misleading filenames

and extensions.  For example, files with the extension ".jpg" often are image files;

however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

f.        Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

g.        In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.        The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to

discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

2.      In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## CONCLUSION

35.    Based on the above information, there is probable cause to believe that the records and information described in Attachment B will be on the SUBJECT COMPUTER MEDIA DEVICES (Samsung Laptop Computer, S/N: 62Y93FP700076R; Hitachi Hard Drive, S/N: KGGEM5LE; Apple iMac Computer, S/N: C02KCEHHDNCR; Seagate External Hard Drive, S/N: 2GE7T0NC; Western Digital My Passport, S/N: WX31EA1HJ696; Transcend 8GB Thumb Drive; Sandisk Cruzer Blade Thumb Drive 4 GB) in violation of Title 18, United States Code,

Sections 2423 (c) and (e), which make it a federal crime for any person to travel in foreign commerce and engaging in illicit sexual conduct or to attempt the same.

36.     Based upon the foregoing, I respectfully request that this Court issue a search warrant for the computer and electronic storage devices described in Attachment A.

Respectfully submitted,

_____

Kristina M. Eyler
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on January 7, 2016:

_____

The Honorable Deborah A. Robinson
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*Property to be searched*

THE PROPERTY TO BE SEARCHED ARE THE FOLLOWING: SAMSUNG LAPTOP
COMPUTER, S/N: 62Y93FP700076R; HITACHI HARD DRIVE, S/N: KGGEM5LE; APPLE
IMAC COMPUTER, S/N: C02KCEHHDNCR; SEAGATE EXTERNAL HARD DRIVE, S/N:
2GE7T0NC; WESTERN DIGITAL MY PASSPORT, S/N: WX31EA1HJ696; TRANSCEND
8GB THUMB DRIVE; SANDISK CRUZER BLADE THUMB DRIVE 4 GB.  THE ITEMS
ARE LOCATED IN THE OFFICE OF THE CHILD EXPLOITATION SECTION OF THE
CRIMINAL DIVISION OF THE UNITED STATES DEPARTMENT OF JUSTICE,
LOCATED AT 1400 NEW YORK AVENUE NW, SIXTH FLOOR, WASHINGTON, D.C.
20005.

# ATTACHMENT B

## ITEMS TO BE SEIZED

1. Records, documents, files, file remnants, forensic electronic evidence or information, digital photographs or videos, or electronic communications, related to the interstate or foreign travel of Joseph Ricky PARK, also known as Joseph DEMASI ("PARK").

2. Records, documents, files, file remnants, forensic electronic evidence or information, digital photographs or videos, or electronic communications, related to PARK's residency in the United States or in a foreign country.

3. Records, documents, files, file remnants, forensic electronic evidence or information, digital photographs or videos, or electronic communications, related to PARK's citizenship.

4. Records, documents, files, file remnants, forensic electronic evidence or information, digital photographs or videos, or electronic communications, related to PARK's employment while traveling abroad.

5. Records, documents, files, file remnants, forensic electronic evidence or information, digital photographs or videos, or electronic communications, related to the contact or communication between PARK and any minors.

6. Any identifying information of any minors that PARK had contact with including names, addresses, phone numbers, email addresses, internet screen names or accounts, digital photographs and videos.

2

7.   Records, documents, files, file remnants, forensic electronic evidence or information, digital photographs or videos, or electronic communications that indicate a sexual interest in children by PARK.

8.   Records, documents, files, file remnants, forensic electronic evidence or information, digital photographs or videos, or electronic communications, related to the sexual exploitation of minors by PARK.

9.   Records, documents, files, file remnants, forensic electronic evidence or information, digital photographs or videos, or electronic communications that indicate ownership and/or possession of each of the items listed in Attachment A or of items depicted in any minor-related materials found on the items listed in Attachment A.